### 18349. FAMBROUGH v. FAMBROUGH, Executor.

HEAD, Justice. 1. "When a parol agreement whereby one is to receive title to land, in consideration for services rendered another, is sought to be enforced, the proof of such contract should be so clear, strong, and

satisfactory, as to leave no reasonable doubt as to the agreement." *Barnett* v. *Henry*, 200 *Ga.* 365 (37 S. E. 2d 340). "A party seeking specific performance of a contract must show substantial compliance with his part of the agreement; otherwise he is not entitled to a decree." *Lee* v. *Lee*, 191 *Ga.* 728 (13 S. E. 2d 774); *Christopher* v. *Whitmire*, 199 *Ga.* 280 (34 S. E. 2d 100). Under the foregoing rules, the verdict for the defendant was demanded by the evidence.

2. Grounds 4, 5, and 6 of the amended motion assign error on extracts from the charge of the court. These assignments of error are not grounds for reversal when the verdict was demanded by the evidence. *Jones* v. *Warren & Hobbs*, 60 *Ga.* 359; *Taylor* v. *Street*, 82 *Ga.* 723 (9 S. E. 829); *Charleston & Savannah Ry. Co.* v. *Green, Gaynor & Co.*, 95 *Ga.* 362 (22 S. E. 540); *Poole* v. *Atlanta Joint Stock Land Bank*, 189 *Ga.* 59, 65 (5 S. E. 2d 368); *Lunsford* v. *Armour*, 194 *Ga.* 53 (20 S. E. 2d 594); *Castile* v. *Burton*, 200 *Ga.* 877, 883 (3) (38 S. E. 2d 919); *Richardson* v. *Hairried*, 202 *Ga.* 610, 615 (2) (44 S. E. 2d 237).

3. In ground 7 of the amended motion for new trial, error is assigned on the exclusion from evidence of three letters from the petitioner to his parents, in which it appears that the petitioner sent to his parents certain money, with instructions to use it if they needed it. The letters were excluded by the trial judge under the Code, § 38-1603 (1). They did not relate to the alleged contract to make a will, nor did they show that the petitioner had supported his parents. Under the petitioner's own testimony, the money was deposited in a bank by the petitioner's father in the name of the petitioner, and the petitioner later withdrew the money, after he was discharged from military service. Reversible error is not shown by this ground.

*Judgment affirmed. All the Justices concur.*

Argued September 15, 1953—Decided October 13, 1953.

*Orrin Roberts, Reuben M. Tuck*, for plaintiff in error.
*C. R. Vaughn, Jr., A. F. Jenkins*, contra.

On the former appearance of the present case (*Fambrough* v. *Fambrough*, 209 *Ga.* 23, 70 S. E. 2d 468), this court construed the petition as being an equitable action for the specific performance of an alleged parol contract to make a will, in consideration of services rendered to the deceased and his wife. Upon the trial of the cause the jury returned a verdict for the defendant. The petitioner's motion for new trial, as amended, was denied, and the exception is to that judgment. The testimony of the petitioner's witnesses was in part as follows:

Mrs. Guy Mallory testified in part: "I have heard Mr. and Mrs. Fambrough discuss the contract they had with Marvin time after time. What I heard was, you know, just by them talking

on several occasions, they wasn't telling me at all, but I was there in their presence at the time they were talking. He told— Mrs. Fambrough got after him to sell the place and move to Covington. Mr. Fambrough, Marvin's daddy, said he was not selling that place under no circumstances, and he was not making no will regardless of what, that whenever—when he died, that Marvin was supposed to have that place and for to take care of him and her as long as she lived. . . Whenever Mr. Fambrough died, she [the petitioner's mother] moved out and left and went with the other boys—with Jack, she moved in the house with Jack after he died. I don't know why she moved, just didn't feel like staying there. Mrs. Fambrough is around 70 years old, and she, of course, lived in the home with her husband, Mr. Fambrough, until he died in 1950. She had normal health for her age at that time. She was pretty active. She cooked meals, and she looked after her husband about as well I reckon as anybody could, you know, with a sick person. She spent most of her time crocheting. . . I stated a conversation between Mr. and Mrs. Fambrough with relation to this property being given to Marvin. I also mentioned about a will. He said he was not making no will regardless of what nobody said. I'm not sure about that will now. I know it was probated, and know it was admitted on the records as will of Mr. Fambrough. I contested that will, they wanted me to sign it and I ain't never done it and I never will do it. . . I said that Mr. Fambrough, the old gentleman, said he did not make a will. As to whether I was present at the probation of the will and testified it was not his signature: I'm not sure, but I'm not going to swear whose signature. He said absolutely, he was not making a will regardless of what nobody wanted him to do. I testified there when the will was probated, and it was admitted to the records as being the will of Mr. Fambrough. . . As to whether in the year 1949, Mr. Marvin Fambrough worked on that property under an agreement with his father, to farm part of the property and help his father farm his part: Well, he farmed his daddy's and his together. Mr. Fambrough wasn't able to get out there to farm. In 1949, Mr. Fambrough was paid for his services on his daddy's farm by his father allowing him to work part of the farm and keep the proceeds from it. . . I can't remember

. . . how they had the agreement. But Marvin cultivated the land in '48 and '49 with his tractor, with his own tools and tractor and things and never charged his daddy nothing. I think his father swapped and give him property for his labor. It was worked in 1948 just about the same. From the time that Marvin came back from the army, up till the death of his father, that was the way in which they farmed to the best of my knowledge."

Mrs. Marvin Fambrough, wife of the petitioner, testified in part as follows: "I lived in Covington before I married and I had just visited there one time is all before I married. Mr. Fambrough told Marvin and me too, he told him a week before he died, certainly did, he told him, he said son . . . I'm not going to be here with you long, and Marvin said, don't talk like that daddy. He said, I ain't unless things get better here and I improve, I'm not going to be here long, but said, I want you to stay here and look after this home and take care of your Mama if she'll stay with you. That's the very words he told Marvin. That was one week before Marvin's daddy died. . . When I first went to the home, I didn't know of any understanding between them. I didn't know anything about it until I married in the family. But he told Marvin in my presence after we married, and I also heard Mrs. Fambrough say it. He told Marvin the home was to be his when—after he and Mrs. Fambrough had passed on. . . As to what kind of agreement my husband had with his father as to my husband having a separate tract to cultivate provided he used his equipment and helped Mr. Fambrough, his father: We planted ten acres apiece in cotton, and we planted corn but I don't know how much, and his father did have more or less a separate—two farms really, that was the idea behind it. He was to help Mr. Fambrough cultivate his part. I don't know what the agreement was but Marvin just worked all through just like he did all the time. He paid one bale rent. He didn't have one of his own till 1947, and from then on he paid rent, plus helping Mr. Fambrough look after his part of the crop. They had ten acres of cotton apiece."

The petitioner in his testimony stated in part as follows: "In a way we had the farm divided up, after I married and went to keeping house I was going to leave. All the rest of the children had done got out and made a home of their own and I wanted

me a home just like anybody else does. And they all agreed, the sisters and brothers and all agreed if I would stay on there and work and look after them and do the best I could for him, and they didn't have nothing in, the place and they wasn't expecting nothing out of it, and said if you stay on here and look after them what's here will belong to you when they pass on. That's what they said. That's the reason why its here in court today. . . In 1949 I had about 20 acres planted. Ten acres was mine and ten was my daddy's. We were farming separate at that time. I made six and a half bales on mine and he made six and a half on his. . . As to why we changed over and I had ten and he had ten, and then he had ten and I had nine: Well, so I would have a little income from my work, and I paid for all the fertilizer and all the tools that I used. And after he got so feeble and after I went to having a crop, I gave him a bale of cotton to help pay the taxes and help keep the buildings up. You might call it paying my father rent, if you want to, but it wasn't rent between me and him, it was just to help keep up the place. . . I sent my father money while I was in service and he used some of it for paying up my insurance, life insurance that I had. I also told him to use it, all he wanted of it, that is there in the letter. The jury can read them. He deposited the money in my name, but I didn't know it until after I got home. When I got home I drew it out."